1

2

3

4

5                               UNITED STATES DISTRICT COURT

6                              NORTHERN DISTRICT OF CALIFORNIA

7

8    STEVEN DHILLON, *et al.*,                      No. C-10-0723 EMC

9              Plaintiffs,

10          v.                                       **ORDER DENYING PETITIONERS'**
                                                     **MOTION FOR EMERGENCY**
11   ALEJANDRO MAYORKAS, *Director, U.S.*            **TEMPORARY RESTRAINING ORDER**
     *Citizenship & Immigration Services, et al.*,
12                                                   **(Docket No. 3)**
               Defendants.
13   _____/

14

15          Plaintiffs Steven Dhillon and Ruby Dhillon, husband and wife, have filed suit against the

16   federal government.  In their complaint, they assert that actions taken by the United States

17   Citizenship and Immigration Services ("USCIS") were arbitrary and capricious and further have

18   undermined the fundamental fairness of the removal proceedings involving Ms. Dhillon.  Currently

19   pending before the Court is Plaintiffs' motion for an emergency temporary restraining order

20   ("TRO"), in which they seek to stay the removal of Ms. Dhillon from the United States to the

21   Philippines pending a resolution of her case on the merits.  The parties have stipulated to a

22   temporary stay of removal pending the Court's hearing and ruling on this pending motion.  *See*

23   Docket No. 31 (stipulation).

24                       **I.   FACTUAL & PROCEDURAL BACKGROUND**

25   A.    Investigation of Ms. Dhillon

26          Plaintiffs' situation stems from Ms. Dhillon's efforts to obtain permanent resident status.

27   The process which provides the framework for that adjustment of status is described as follows.

28

United States District Court
For the Northern District of California

1
2
3
4
5
6

> Certain relatives, including spouses, of United States citizens may obtain lawful permanent resident status based on that familial relationship. *See* 8 U.S.C. § 1151(a)(1); (b)(2)(A)(i) (regarding immediate relatives including spouses). A citizen spouse must go through a two-step process to petition for lawful permanent status for an alien spouse. First, the citizen spouse must file a Form I-130 visa petition with the USCIS on behalf of the alien spouse. *See* 8 U.S.C. § 1154(a)(1)(A)(1); 8 C.F.R. § 204.1(a)(1), 204.2(a). If the petition is approved, the alien spouse may then seek adjustment of his status to a lawful permanent resident by filing a Form I-485 application for adjustment of status. *See* 8 U.S.C. § 1255; 8 C.F.R. § 245.1(a).

7
8

*Tandel v. Holder*, No. C-09-01319 EDL, 2009 U.S. Dist. LEXIS 78362, at *3-4 (N.D. Cal. Sept. 1, 2009.

9
10
11
12
13
14

In the instant case, Ms. Dhillon appears to have entered the United States in 1995, using a passport in the name of Josephine Mendoza which she was provided for 150,000 pesos. *See* Pl.'s Mot., Ex. 9, at 24 (Form I-213 report, signed by Special Agent Craig Stutheit). In 1997, Ms. Dhillon filed an application (Form I-485) to adjust her status to that of a lawful permanent resident based on her marriage to a U.S. citizen, Dionisio Sagrado. *See* Pl.'s Mot., Ex. 9, at 356-61 (application). At the same time, her then-husband Mr. Sagrado filed a visa petition (Form I-130) on her behalf.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

On May 27, 1998, agents for the former Immigration and Naturalization Service ("INS") interviewed Ms. Dhillon based on an anonymous tip that she was in the country illegally. As indicated in the Form I-213 report filled out by one agent, Ms. Dhillon stated that she was married to a U.S. citizen who had filed a petition with the INS for her. The agents accompanied Ms. Dhillon to her asserted residence in San Bruno, but she had to call the landlord to meet them there because she did not have keys to the place. When they arrived at the residence, the landlord was not there, and an agent asked Ms. Dhillon if her husband would have keys to the residence. Ms. Dhillon stated that he should and that he was in South San Francisco helping to babysit his brother's children. The agent called Mr. Sagrado at the number provided and asked where he and Ms. Dhillon lived. Mr. Sagrado replied that they lived at 14 Antoinette Street, San Mateo. When asked if that was his present location, Mr. Sagrado stated that it was. The agent then asked Mr. Sagrado about the residence in San Bruno. Mr. Sagrado responded that he sometimes lived with Ms. Dhillon in San Bruno; however, when he was asked for the address, he was not able to provide the correct one. In addition, Mr. Sagrado's answer as to when he had last seen Ms. Dhillon differed from Ms. Dhillon's

United States District Court

For the Northern District of California

answer, and "[m]any questions that a married couple should be able to answer without problems were answered differently by [the two]."  Pl.'s Mot., Ex. 9, at 24 (Form I-213 report).  Accordingly, the agent detained Ms. Dhillon for further investigation.

The agent then called Ms. Sagrado to speak to him further.  Mr. Sagrado apparently was not at 14 Antoinette Street, San Mateo, but rather at 14 Antoinette Street, South San Francisco.  Two agents then proceeded to that location and questioned Mr. Sagrado about his petition and his relationship with Ms. Dhillon.

> When confronted with the inaccuracies in his and his wife's story and the possible consequences [Mr. Sagrado] stated that [Ms. Dhillon] had paid him to marry her.  He provided a statement indicating that he wished to withdraw his petition . . . and that the marriage was entered into so that she could obtain a green card.  He stated that she offered to pay him $5,000 to marry her and that she had paid him approximately $1,200 as of [that] date.  She paid him approximately $200 ever two weeks and had paid him $200 [three days earlier].  He further stated that the marriage had not been consummated and that they never lived together as man and wife.

Pl.'s Mot., Ex. 9, at 24-25 (Form I-213 report).

B.    Denial of Ms. Dhillon's Form I-485 Application and Initiation of Removal Proceedings

The next day, *i.e.*, May 28, 1998, the INS denied Ms. Dhillon's application for status as a permanent resident.  The INS explained: "The visa petition supporting the [Form I-485] application has been withdrawn on May 27, 1998 and the petitioner, Dionisio Sagrado, has admitted that he and [Ms. Dhillon] entered into the marriage for the sole purpose of obtaining immigration benefits."  Pl.'s Mot., Ex. 9, at 434 (INS decision).  That same day, the INS issued to Ms. Dhillon a notice to appear, which initiates removal proceedings.  The notice to appear reflected that removal proceedings were being initiated on the basis of Ms. Dhillon's fraudulent entry into the United States.  *See* Pl.'s Mot., Ex. 9, at 339 (notice to appear).

Approximately eight months later, in January 1999, Mr. Sagrado and Ms. Dhillon divorced.  *See* Pl.'s Mot., Ex. 9, at 295-96 (final decree of divorce).  Several days thereafter, Ms. Dhillon applied for cancellation of removal on the basis that "I, or my child, have been battered or subjected to extreme cruelty by a United States citizen or lawful permanent resident spouse or parent."  Pl.'s Mot., Ex. 9, at 246 (application for cancellation of removal).

C.    Mr. Dhillon's I-130 Visa Petition and Ms. Dhillon's Removal Proceedings[1]

Approximately two years later, in March 2001, Ms. Dhillon married Mr. Dhillon. *See* Pl.'s Mot., Ex. 9, at 144 (marriage certificate). Mr. Dhillon then filed a Form I-130 visa petition on behalf of Ms. Dhillon. *See* Pl.'s Mot., Ex. 9, at 134-35 (Form I-130). In July 2002, the INS issued a notice of intent to deny. It explained that, under 8 U.S.C. § 1154(c),[2] no petition shall be approved if the alien has previously sought to be accorded a nonquota or preference status as the spouse of a citizen of the United States by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws. The INS gave Mr. Dhillon eighteen days "to submit evidence in support of your petition and in opposition to the grounds stated above for the intended denial." Pl.'s Mot., Ex. 9, at 132 (notice of intent to deny).

In March 2003, the newly formed USCIS formally denied the I-130 visa petition, reaffirming that the basis of the denial was § 1154(c). The agency noted that, although Mr. Dhillon had been given time to respond to the notice of intent to deny, he had "failed to offer evidence in support of [his] petition and in opposition to the stated grounds for the intended denial." Pl.'s Mot., Ex. 9, at 130 (INS decision). The agency also noted that the denial of the I-130 visa petition could be appealed to the Board of Immigration Appeals ("BIA"). *See* Pl.'s Mot., Ex. 9, at 129.

In April 2003, then-counsel for Mr. Dhillon initiated an appeal with the BIA. Counsel stated:

> We will provide evidence under separate cover. However, we did present evidence sufficient to overcome the denial. The position

---

[1] The visa petition proceedings are technically separate from the removal proceedings.

[2] Section 1154(c) provides:

> Notwithstanding the provisions of subsection (b) no petition shall be approved if (1) the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence, by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws, or (2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.

8 U.S.C. § 1154(c).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

> of the petitioner is that the marriage ended in an acrimonious fashion and that the spouse, using the best tool one has against an immigrant, falsely claimed that the marriage was entered into solely for the immigration benefits and that money was exchanged.

Pl.'s Mot., Ex. 9, at 125 (letter). Counsel also suggested that there had in fact been a bona fide marriage between Ms. Dhillon and Mr. Sagrado because, during the course of the marriage, Mr. Sagrado had written to the INS asking that the I-130 visa petition be adjudicated. Copies of two letters provided by counsel showed that they were signed by both Mr. Sagrado and Ms. Dhillon. *See* Pl.'s Mot., Ex. 9, at 126-27 (letters). Those letters merely seek information regarding status. Neither asserts facts or contains evidence. It appears that nowhere in the record is there any evidence in the form of testimony or documents authored by either Mr. Sagrado or Ms. Dhillon supporting counsel's assertions.

On April 24, 2003, prior to the decision of the BIA on the I-130 visa petition, a hearing was held before an immigration judge (IJ) as part of Ms. Dhillon's removal proceedings. *See* Pl.'s Mot., Ex. 9, at 102 (transcript). During the hearing, Ms. Dhillon sought a continuance of the removal proceedings pending a decision by the BIA on her husband's I-130 visa petition. The IJ denied the request to continue, noting that "any form of relief at this point, adjustment of status[,] would be highly speculative at best." Pl.'s Mot., Ex. 9, at 104.

Turning to the substantive issue – *i.e.*, whether there should be removal – the IJ first took into consideration the Form I-213 report prepared by the INS special agent who had investigated Ms. Dhillon. Counsel for Ms. Dhillon objected to the report on the basis of hearsay. *See* Pl.'s Mot., Ex. 9, at 105. The IJ overruled the objection, noting that "one of the persons making statements here is [Ms. Dhillon] herself[;] if there's something she wishes to rebut in this she is welcome to attempt to do so. But if she's not going to, then I'm going to mark the I-213 into evidence."[3] Pl.'s Mot., Ex. 9, at 106. Ultimately, Ms. Dhillon did not testify. *See* Pl.'s Mot., Ex. 9, at 91. The IJ also noted that he would afford Ms. Dhillon an opportunity to cross-examine the declarant "if you had some sort of counter theory to relevance" or "some basis on which to attack the relationship of the I-213."

---

[3] *See also* Pl.'s Mot., Ex. 9, at 90 ("[I]f the document is not in fact reliable then the facts relating to its reliability would be within the knowledge of [Ms. Dhillon] herself.").

United States District Court
For the Northern District of California

1   Pl.'s Mot., Ex. 9, at 105.  Ms. Dhillon's counsel failed to present any such counter-theory or basis.

2   Furthermore, during the proceedings before the IJ, Ms. Dhillon withdrew her application for

3   cancellation of removal and also declined to pursue any relief under the Refugee Act or the

4   Convention Against Torture.  *See* Pl.'s Mot., Ex. 9, at 110.

5      At the conclusion of the hearing, the IJ ruled against Ms. Dhillon, noting, *inter alia*, that the

6   Form I-213 report and the allegations in the notice to appear stood unrebutted, and ordered her

7   removal.  *See* Pl.'s Mot., Ex. 9, at 88-92.  Ms. Dhillon indicated that she would be appealing.  *See*

8   Pl.'s Mot., Ex. 9, at 111.

9      Several months later, in August 2004, the BIA summarily affirmed the IJ's denial of Ms.

10  Dhillon's request for a continuance.  Thereafter, Ms. Dhillon filed a motion to reopen her removal

11  proceedings, which the BIA denied in December 2004.  In its decision, the BIA found that there was

12  no new evidence presented warranting reopening and that Ms. Dhillon did not have standing to

13  appeal the I-130 visa denial.  The BIA also emphasized that "[her] removal proceedings and [her

14  husband's] visa petition proceedings are separate and independent proceedings" and that the issues

15  "are not so intertwined as to warrant consolidation of the appeals."  Pl.'s Mot., Ex. 9, at 72 (BIA

16  decision).  The BIA noted a positive outcome in a visa petition proceeding "had no effect on an

17  alien's removability from the United States."  Pl.'s Mot., Ex. 9, at 72.  At most, it could affect an

18  alien's eligibility for discretional relief from removal.

19     Some three and a half years later, in June 2008, the BIA finally ruled on Mr. Dhillon's

20  appeal of the denial of his I-130 visa petition.  Like the USCIS, the BIA noted that Mr. Dhillon had

21  been "given a period of time to respond to the information in the Notice of Intent to Deny, but failed

22  to offer any evidence in response.  The beneficiary argued only that the divorce from her prior

23  husband was bitter."[4]  Pl.'s Mot., Ex. 9, at 13.

---

[4] Mr. Dhillon later filed a second I-130 petition on behalf of his wife.  *See* Compl. ¶ 28.  That petition was denied on July 21, 2009, and Mr. Dhillon appealed.  On March 17, 2010, the BIA remanded so that certain evidence could be placed in the record and so that USCIS could issue a notice of intent to deny and a new decision.  *See* Docket No. 35 (Ex.) (BIA decision).  At the hearing, the Dhillons represented that, in this lawsuit, they are not making any challenge to a decision related to the second I-130 petition.

Subsequently, Ms. Dhillon appealed the BIA's denial of her motion to reopen the removal proceedings to the Ninth Circuit. In November 2009, the Ninth Circuit dismissed the petition for review. The court noted that, in June 2008, the BIA had denied Mr. Dhillon's appeal of the denial of his I-130 visa petition. "Thus, even if we were to order the BIA to reopen [Ms. Dhillon's] proceedings, her requested relief can no longer be obtained. Because the court could not grant 'any effectual relief' addressing [Ms. Dhillon's] petition at this stage of the proceedings, [her] petition is moot and must be dismissed." *Sagrado v. Holder*, No. 05-70448, 2009 WL 4827008, at *1 (9th Cir. Nov. 24, 2009). The Ninth Circuit added that the BIA properly denied Ms. Dhillon's motion to reopen because she did not submit any new evidence with her motion to reopen. *See id.*

On February 19, 2010, the Dhillons initiated this lawsuit. *See* Docket No. 1 (complaint). In the complaint, the Dhillons assert a claim under the Administrative Procedures Act ("APA"). They allege that,

> [b]y refusing to allow Mrs. Dhillon an opportunity to cross-examine Mr. Sagrado or the author of the INS investigative report [*i.e.* the I-213 report], USCIS acted arbitrarily, capriciously, and contrary to law under 5 U.S.C. § 706(2)(A). Furthermore, USCIS actions have clearly violated INA § 240(b) [*i.e.*, 8 U.S.C. § 1229a(b)] and undermined the fundamental fairness of Mrs. Dhillon's removal proceedings.

Compl. ¶ 30.

## II.  DISCUSSION

A.    Jurisdiction Over Removal Proceedings

As a preliminary matter, the Court notes that, based on the allegations in the Dhillons' complaint, it is not entirely clear whether they are challenging (1) the denial of the first I-130 petition, (2) the removal decision, or (3) both. As reflected above, ¶ 30 of the complaint does suggest that a challenge is being made to the removal proceedings. At the hearing on the motion, it became clear that the Dhillons are in fact contesting, *inter alia*, the removal proceedings. The gist of that claim is that, during the removal proceedings before the IJ, the IJ was wrongfully barred from considering whether or not the USCIS properly determined that Ms. Dhillon's first marriage to Mr. Sagrado was fraudulent. The Dhillons argued that, during the removal proceedings before the IJ,

1   they should have been permitted to cross-examine Mr. Sagrado and/or the author of the I-213 report

2   to rebut the finding that the first marriage was fraudulent.

3          The threshold problem for the Dhillons is that this Court is not the proper court to entertain

4   such a challenge.  Under 8 U.S.C. § 1252(a)(5), "a petition for review filed with an appropriate *court*

5   *of appeals* in accordance with this section shall be the sole and exclusive means for judicial review

6   of an order of removal entered or issued under any provision of this Act, except as provided in

7   subsection (e)."  8 U.S.C. § 1252(a)(5) (emphasis added).  Therefore, to the extent the Dhillons are

8   making a due process or fundamental fairness argument – whether based on the Constitution or

9   statute, *see* 8 U.S.C. § 1229a(b)(4) (providing that, in removal proceedings, "the alien shall have a

10  reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's

11  own behalf, and to cross-examine witnesses presented by the Government") – that is a claim that

12  must be brought before the Ninth Circuit, not this Court.[5]

13         The Dhillons' reliance on *Cunanan v. Immigration & Naturalization Serv.*, 856 F.2d 1373

14  (9th Cir. 1988), is unavailing.  There, the Ninth Circuit did find that the BIA had acted arbitrarily

15  and capriciously by denying the alien's request for voluntary departure because, in making the

16  denial, it relied on a hearsay document – *i.e.*, an affidavit from a former spouse in which she claimed

17  that the marriage was fraudulent – without giving the alien a reasonable opportunity to cross-

18  examine the ex-wife.  But even though *Cunanan* may support the Dhillons' position on the merits,

19  the case does nothing to establish that this Court, instead of the Ninth Circuit, has jurisdiction.

20         Accordingly, to the extent the Dhillons are challenging the removal proceedings, the Court

21  lacks jurisdiction over the claim and cannot provide the requested relief.

22  B.    Authority to Issue Stay of Removal

23         That the Court lacks jurisdiction over removal proceedings, however, is not dispositive of the

24  pending motion or, for that matter, this entire case.  The parties agree that this Court has jurisdiction

25  to the extent the Dhillons are contesting the denial of the I-130 visa petition.  Although, as noted

27  [5] As indicated above, Ms. Dhillon did seek relief from the Ninth Circuit with respect to the
28  removal proceedings but the Ninth Circuit declined to reopen the proceedings.  *See generally Sagrado*,
    2009 WL 4827008.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

above, it was not entirely clear that the Dhillons are making such a challenge based on the allegations in the complaint, they clarified at the hearing that their complaint includes such a challenge.  Furthermore, the government does not make any argument that it has not been on fair notice of such a claim.  *See, e.g.*, Opp'n at 9 (asserting that removal of Ms. Dhillon "will not render the [current] APA action moot").

The government does argue, however, that, even if the Court has jurisdiction over the claim challenging the I-130 denial, the specific relief sought by the Dhillons here – *i.e.*, a stay of removal – is jurisdictionally barred pursuant to 8 U.S.C. § 1252(g).  Section 1252(g) provides:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code [28 U.S.C. § 2241], or any other habeas corpus provision, and sections 1361 and 1651 of such title [28 U.S.C. §§ 1361 and 1651], no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.

8 U.S.C. § 1252(g).  According to the government, in the instant case, ICE has decided to execute the removal order with respect to Ms. Dhillon and therefore the specific relief sought by the Dhillons – *i.e.*, a stay of Ms. Dhillon's removal – is jurisdictionally barred.

In *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) (hereinafter *AADC*), the Supreme Court explained that "[s]ection 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion."[6]  *Id.* at 485 n.9.  But, notably, the *AADC* Court rejected the interpretation that "§ 1252(g) covers the universe of deportation

---

[6] According to the Court,

> [T]here was good reason for Congress to focus special attention upon, and make special provision for, judicial review of the Attorney General's discrete acts of "commenc[ing] proceedings, adjudicating cases, [and] execut[ing] removal orders" – which represent the initiation or prosecution of various stages in the deportation process.  At each stage, the Executive has discretion to abandon the endeavor, and at the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as "deferred action") of exercising that discretion for humanitarian reasons or simply for its own convenience.

*AADC*, 525 U.S. at 483-84.

claims," explaining that, instead, "what § 1252(g) says is much narrower.  The provision applies

only to three discrete actions that the Attorney General may take: her 'decision or action' to

'*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"  *Id.* at 482 (emphasis in

original).

> To make it clear that § 1252(g) is to apply narrowly, the *AADC*
> Court listed examples of other decisions or actions that occur during
> the deportation process to which § 1252(g) does not apply.  These
> examples are "the decisions to open an investigation, to surveil the
> suspected violator, to reschedule the deportation hearing, to include
> various provisions in the final order that is the product of the
> adjudication, and to refuse reconsideration of that order."  Because
> some of the examples could be squeezed into one of the three listed
> actions if the actions were to be read expansively, the examples
> reinforce the Court's express statement that § 1252(g) "applies only to
> three discrete actions" and its descriptions of § 1252(g) as a "narrow"
> one.

*Mustata v. U.S. Department of Justice*, 179 F.3d 1017, 1021(6th Cir. 1999) (quoting *AADC*, 525

U.S. at 482).

The government's position that § 1252(g) places a jurisdictional bar on the specific relief

sought by the Dhillons here – *i.e.*, a stay of removal – is not without some legal support.  As the

government notes in its opposition, in *Chowdhury v. Ashcroft*, 241 F.3d 848 (7th Cir. 2001), the

Seventh Circuit held that, under § 1252(g), it lacked jurisdiction to consider a habeas petition in

which the petitioner asked that the INS be enjoined from executing a deportation order based on the

ineffective assistance provided by his previous counsel during the administrative process.  The court

emphasized:

> [A]t the end of the day [the petitioner] was asking the district court to
> stay the execution of his deportation order, pending a Board [of
> Immigration Appeals] decision on his motion to reopen.  He was
> therefore attacking one of the three specific actions over which §
> 1252(g) forecloses review – the execution of a removal order – and
> was squarely within the jurisdictional bar.

*Id.* at 851.[7]

---

[7] In *Cervantes v. Hernandez v. Chertoff*, 368 F. Supp. 2d 896 (E.D. Wisc. 2005), the district
court noted that there appeared to be conflicting authority in the Seventh Circuit regarding the
application of § 1252(g).  The district court pointed out that, in another Seventh Circuit case, the habeas
petitioner was challenging the Attorney General's denial of his application for adjustment of status but

But there is also legal authority supporting Plaintiffs' position.  For example, in *Mustata*, 179 F.3d at 1017, the Sixth Circuit was confronted with a situation similar to that which the Seventh Circuit confronted in *Chowdhury* – *i.e.*, a habeas petition in which the petitioners claimed ineffective assistance of counsel during their administrative proceedings.  As part of the petition, the petitioners asked that the district court issue an order staying their deportation pending a ruling on their motion to reopen before the immigration judge (and if necessary pending an appeal to the Circuit Court of Appeals).  *See id.* at 1019, 1022.  Unlike the Seventh Circuit, however, the Sixth Circuit concluded that § 1252(g) was not a jurisdictional bar.  The court explained that the petitioners'

> claim is not one to the Attorney General's decision or action to "execute [a] removal order."  The facts relevant to their claim – essentially that their counsel failed to investigate and present relevant evidence – took place well before any decision by the Attorney General to execute a removal order. . . . *The fact that the [petitioners] in their petition seek a stay of deportation does not make their claim one against the decision to execute a removal order.*  The substance of their claim is that their counsel's failure to investigate and present relevant evidence resulted in a violation of their due process rights.  Whether or not the Attorney General executes a removal order against the [petitioners] is immaterial to the substance of this claim.  *Respondents' argument to the contrary confuses the substance of the [petitioners'] claim with the remedy requested.*

*Id.* at 1022-23 (emphasis added).

The Sixth Circuit's position is consistent with the language of § 1252(g) which refers to a lack of jurisdiction over "*any cause or claim* by or on behalf of any alien arising from the decision or action by the Attorney General to . . . execute removal orders."  8 U.S.C. § 1252(g) (emphasis added).  And the Sixth Circuit's approach in *Mustata* has been followed by at least one judge in this district.  In *Garcia-Guzman v. Reno*, 65 F. Supp. 2d 1077 (N.D. Cal. 1999), Judge Henderson held that § 1252(g) was not a jurisdictional bar to the habeas petitioner's challenge to the manner and

---

was asking, at the same time, for a stay of removal.  The Seventh Circuit held: "'Although [the petitioner] obviously wants this court to stop the execution of the removal order, that fact comes into the case only incidentally.  His claim is not that the Attorney General is unfairly executing a removal order, but rather that a prior, unrelated error makes his removal improper.'"  *Id.* at 903 (quoting *Fornalik v. Perryman*, 223 F.3d 523, 532 (7th Cir. 2000)).

The district court reconciled the conflicting authority by holding that, while it could entertain the habeas petitioner's claim challenging the legal validity of the deportation order (*i.e.*, the existence of the order rather than its execution), it could not stay her removal while considering that claim.  *See id.* at 903-04.

United States District Court

For the Northern District of California

1   method by which his removal proceedings were handled – *i.e.*, the immigration judge's conclusion

2   that she could not order a change of venue without approval from the INS, the INS's failure to notify

3   counsel of changes in the petitioner's place of detention, and the INS's decision to conduct removal

4   proceedings in a location that interfered with his attorney-client relationship. *See id.* at 1082.  Judge

5   Henderson emphasized: "Here, just as in *Mustata*, petitioner [is] challeng[ing] the statutory and

6   constitutional foundation for other decisions made during his removal proceedings," not the

7   decisions itemized in § 1252(g).  *Id.* at 1083.

8           The government cites *Barapind v. Reno*, 225 F.3d 1100 (9th Cir. 2000) as overriding Judge

9   Henderson's decision.  But its reliance on *Barapind* is taken out of context.  In *Barapind*, the court

10  actually held that § 1252(g) did not bar jurisdiction over the habeas petition at issue.  The full quote

11  from *Barapind* is as follows:

12              We also need not consider whether § 1252(g) forecloses our
            ability to determine whether the BIA's decision to stay asylum
13          proceedings was proper because the BIA's stay order implicates a
            "decision or action by the Attorney General to commence proceedings,
14          adjudicate cases, or execute removal orders."  A direct corollary to our
            holding that § 1252(g) does not repeal the availability of habeas relief
15          is that that provision also does not "modify or amend" the scope of our
            habeas review.  Thus, the scope of our habeas review of the BIA's
16          decision to stay [the petitioner's] asylum proceedings is not limited by
            § 1252(g).

17

18  *Id.* at 1110.

19          Moreover, it should be noted that other Ninth Circuit authority is actually favorable to the

20  Dhillons, and not the government.  In *Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998) – a case

21  decided prior to the Supreme Court's *AADC* opinion – the plaintiffs had alleged that

22              the procedures by which INS agents procured waivers of the right to a
            hearing in document fraud proceedings were constitutionally deficient
23          because the forms used in connection with these proceedings did not
            adequately inform aliens of their right to a hearing or of the drastic
24          immigration consequences that would ensue if the alien failed to
            request a hearing.

25

26  *Id.* at 1037-28.  At the trial level, the district court certified a class, ruled on summary judgment that

27  the procedures and forms used by the INS in document fraud cases were unconstitutional, and

28  granted a permanent injunction which, *inter alia*, prohibited the future deportation of aliens who

1  received inadequate notice.  On appeal, the government argued that, under § 1252(g), the district

2  court did not have jurisdiction to order any relief that interfered with the government's attempt to

3  execute deportation orders against the class members.  The Ninth Circuit rejected this argument,

4  stating as follows:

> [T]he government does not assert that the district court was without
> jurisdiction to hear the claims brought by the plaintiffs, not could it.
> By its terms, the statutory provision relied upon by the government
> [*i.e.*, § 1252(g)] does not prevent the district court from exercising
> jurisdiction over the plaintiffs' due process claims.  Those claims do
> not arise from a "decision or action by the Attorney General to
> commence proceedings, adjudicate cases, or execute removal orders
> against any alien," but instead constitute "general collateral challenges
> to unconstitutional practices and policies used by the agency."

10  *Id.* at 1052.  The Ninth Circuit added: "Although the constitutional violations ultimately may have

11  led to the plaintiffs' erroneous deportation, the resulting removal orders were simply a consequence

12  of the violations, not the basis of their claims."  *Id.*

13       Based on *Mustata*, *Garcia-Guzman*, and *Walters*, the Court rejects the government's position

14  that § 1252(g) is a jurisdictional bar to the relief requested by the Dhillons – *i.e.*, a stay of removal.

15  As those authorities indicate, the stay sought on the removal order is not based on the Attorney

16  General's decision to commence, adjudicate, or execute a remand order within the meaning of §

17  1252(g).  Indeed, the Dhillons' claim challenging the I-130 petition denial is fully collateral to the

18  removal proceedings, more so than was the case in *Mustata, Garcia-Guzman,* and *Walters*.  It is

19  based not on the removal proceedings and what occurred therein, but on the handling of the

20  Dhillons' I-130 petition.  As the BIA noted, the I-130 petition proceeding is separate and distant

21  from the removal proceeding against Ms. Dhillon.  The facts relevant to that claim – *i.e.*, that, during

22  the visa petition proceedings, the Dhillons were not given the opportunity to cross-examine either

23  Mr. Sagrado or the INS special agent who prepared the I-213 report – took place well before any

24  decision by the Attorney General to execute a removal order.

25  C.    <u>Merits of Request for TRO</u>

26       Having concluded that it is not jurisdictionally barred from issuing a stay of removal, the

27  Court turns to whether or not the Dhillons are entitled to such preliminary relief.  As reflected in the

28  parties' briefs, in considering whether to stay a removal, a court

United States District Court
For the Northern District of California

1  |  considers four factors: (1) whether the stay applicant has made a
2  |  strong showing that he is likely to succeed on the merits; (2) whether
   |  the applicant will be irreparably injured absent a stay; (3) whether
   |  issuance of the stay will substantially injure the other parties interested
3  |  in the proceeding; and (4) where the public interest lies.

4  *Nken v. Holder*, 129 S. Ct. 1749, 1756 (2009) (internal quotation marks omitted).

5  As a preliminary matter, the Court notes that, in *Nken*, the Supreme Court did not say

6  whether the above standard is to be strictly applied in cases involving requests for stays or whether a

7  sliding scale approach may be used, similar to that used by some courts in evaluating requests for

8  preliminary injunctive relief – *i.e.*, where "[t]he probability of success that must be demonstrated is

9  inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay."

10 *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (internal quotation marks omitted).  Prior to

11 *Nken*, some courts did use the sliding scale approach in evaluating requests for stays,[8] and, in *Nken*,

12 the Supreme Court did take note of the "substantial overlap between [the above factors] and the

13 factors governing preliminary injunctions, not because the two are one and the same, but because

14 similar concerns arise whenever a court order may allow or disallow anticipated action before the

15 legality of that action has been conclusively determined."  *Id.* at 1761.

16 The sliding scale approach, however, seems to have been disavowed by the Ninth Circuit in

17 the wake of a Supreme Court opinion that predated *Nken* – *i.e.*, *Winter v. NRDC, Inc.*, 129 S. Ct. 365

18 (2008).  In *Winter*, the Supreme Court held that "plaintiffs seeking preliminary relief [must]

19 demonstrate that irreparable injury is *likely* in the absence of an injunction" and that "[i]ssuing a

20 preliminary injunction based only on a possibility of irreparable harm is inconsistent with our

21 characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a

22 clear showing that the plaintiff is entitled to such relief."  *Id.* at 375-76 (emphasis in original).  In

23 *Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009), the Ninth Circuit stated:

24  |  Applying *Winter*, we have since held that, "[t]o the extent that
    |  our cases have suggested a lesser standard, they are no longer
25  |  controlling, or even viable."  Thus, the district court's appropriate
    |  application of our pre-*Winter* approach [*i.e.*, the sliding scale
26  |  approach] in granting relief is now error.  The proper legal standard

27 ────────────────────

28  [8] *See, e.g.*, *Thapa*, 460 F.3d at 334; *Nwakanma v. Ashcroft*, 352 F.3d 325, 327-28 (6th Cir. 2003); *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999).

United States District Court

For the Northern District of California

> for preliminary injunctive relief requires a party to demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

*Id.* at 1127.[9]  *But see Citigroup Global Mkts. v. VCG Special Opportunities Master Fund Limited*, No. 08-6090-cv, 2010 U.S. App. LEXIS 5025, at *18 (2d Cir. Mar. 10, 2010) (stating that "[t]he Supreme Court's recent opinions in *Munaf*, *Winter*, and *Nken* have not undermined its approval of the more flexible approach"; adding that "[n]one of the three cases comments at all, much less negatively, upon the application of a preliminary injunction standard that softens a strict 'likelihood' requirement in cases that warrant it").  In any event, Plaintiffs have not argued that a standard different from *Nken* should apply here.

As noted by the *Nken* Court, the factors that are "most critical" in evaluating a request for a stay are the first and second -- *i.e.*, (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits and (2) whether the applicant will be irreparably injured absent a stay.  *Id.* at 1761.

Here, the Court finds that the Dhillons have not made out a strong showing of likelihood of success on the merits.  As the Dhillons agreed at the hearing, the question is whether the USCIS's decision to deny the I-130 visa petition was arbitrary or capricious under the Administrative Procedure Act.  *See* 5 U.S.C. § 706(2)(A) (providing that a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  The Dhillons cannot make out a strong showing that it was arbitrary or capricious for the USCIS to rely on, *inter alia*, the I-213 report in denying the I-130 petition.  While the Dhillons may not have had the opportunity to cross-examine Mr. Sagrado or the special agent who prepared the I-213 report, they did have the opportunity to present any evidence in support of their case.  In this case at least, it should not have been difficult to provide some

---

[9] The Court notes that, in an unpublished opinion prior to *Stormans*, the Ninth Circuit did state that the *Winter* Court "did not reject the sliding scale approach."  *Greater Yellowstone Coalition v. Timchak*, 323 Fed. Appx. 512, 514 n.1 (9th Cir. 2009) (declining to define "the sliding-scale formulation's precise post-*Winter* contours").  But *Stormans* has since issued and therefore the Court is therefore bound by that opinion.

United States District Court

For the Northern District of California

1  rebuttal to the government's evidence because Ms. Dhillon should have had possession, custody, or

2  control of evidence to support the claimed legitimacy of her marriage to Mr. Sagrado.  Instead, the

3  Dhillons offered no real evidence at all, other than a statement by their attorney – and only on the

4  appeal to the BIA – that "the marriage ended in an acrimonious fashion" and two letters signed by

5  Mr. Sagrado and Ms. Dhillon which merely asked about the status of the I-130 visa petition.  *See*

6  Pl.'s Mot., Ex. 9, at 13 (BIA decision) (noting that Mr. Dhillon had been "given a period of time to

7  respond to the information in the Notice of Intent to Deny, but failed to offer any evidence in

8  response" and that "[t]he beneficiary argued only that the divorce from her prior husband was

9  bitter"); Pl.'s Mot., Ex. 9, at 125 (letter from counsel, attached to which were correspondence to INS

10  signed by Mr. Sagrado and Ms. Dhillon).  As noted above, Ms. Dhillon presented no rebuttal

11  evidence or substantiated a counter-theory at any time.  She never submitted a counter-declaration.

12       Courts have held that, under similar circumstances, there has been no arbitrary or capricious

13  agency action.  In *Fisher v. INS*, 79 F.3d 955 (9th Cir. 1996), the Ninth Circuit rejected the alien's

14  contention that the IJ's decision in deportation proceedings was arbitrary and capricious because the

15  IJ relied on hearsay evidence, *i.e.*, affidavit of former spouse.  The court concluded that it was not

16  fundamentally unfair for the IJ to rely on evidence because, *inter alia*, the alien was able to testify

17  about former marriage.  *See id.* at 965.  *See also Ghaly v. INS*, 48 F.3d 1426, 1432, 1435 (7th Cir.

18  1995) (concluding that "the INS provided a rational explanation, supported by substantial evidence,

19  for its revocation of its approval of [alien's] visa petition"; substantial evidence consisted in large

20  part of sworn statement of former spouse that former marriage was fraudulent); *Tandel v. Holder*,

21  No. C-09-01319 EDL, 2009 U.S. Dist. LEXIS 78362, at *9-10 (N.D. Cal. Sept. 1, 2009) (holding

22  that reliance on former spouse's sworn statement that former marriage was fraudulent was not

23  arbitrary and capricious).

24       Finally, to the extent that the Dhillons argue that their due process rights were violated based

25  on their inability to cross-examine either Mr. Sagrado or the author of the I-213 report in the context

26  of the I-130 petition, they have failed to make a strong showing of likelihood of success.  The

27  Dhillons have made no showing that the desired cross-examination would have had any probable

28  value.  Since they failed to present any counter-theory or basis for rebuttal, there is nothing to

United States District Court
For the Northern District of California

1  suggest the reliability of the adjudication of their I-130 petition would have been materially

2  enhanced by cross-examination.  Under *Mathews v. Eldridge*, 424 U.S. 319 (1976), that is one of the

3  key factors that must be considered in determining what process should be constitutionally afforded.

4  *See id.* at 335 (stating that one factor is "the probable value, if any, of additional or substitute

5  procedural safeguards).

6        As for the second *Nken* factors, it too does not weigh significantly in the Dhillons' favor.

7  The Court acknowledges, and is not unsympathetic to, the fact that the Dhillons and their children

8  will be financially and emotionally impacted should Ms. Dhillon be removed.  However, such

9  concerns are at play in any situation involving removal, and the Supreme Court in *Nken* emphasized

10 that "the burden of removal alone cannot constitute the requisite irreparable injury."  *Nken*, 129 S.

11 Ct. at 1761.  While the Court has stronger concerns about the Dhillons' claim that Ms. Dhillon's life

12 will be endangered should she be removed, *Nken* and *Winter* dictate that the mere *possibility* of

13 irreparable injury is not enough; there must be a likelihood.  The Court cannot say that there is a

14 likelihood of irreparable injury given that, during the removal proceedings before the IJ, Ms. Dhillon

15 declined to seek any relief under the Refugee Act or the Convention Against Torture, even though

16 she now alleges her safety would be endangered should she be returned to the Philippines.  *See* Pl.'s

17 Mot., Ex. 9, at 110 (ALJ hearing of 4/24/2003).  Indeed, it does not appear that the Dhillons made

18 any mention of Ms. Dhillon's allegedly abusive ex-husband in the Phillippines until this lawsuit.

19       As for the third and fourth factors (which merge since the government is the opposing party,

20 *see Nken*, 129 S. Ct. at 1761), they also weigh against the Dhillons.  The government and the public

21 have a strong interest in the prompt execution of removal orders, *see id.*, and while "there is a public

22 interest in preventing aliens from being wrongfully removed, particularly to countries where they are

23 likely to face substantial harm," *id.*, as noted above, the likelihood of harm should Ms. Dhillon be

24 removed has not been established.

25 ///

26 ///

27 ///

28 ///

1    Accordingly, the Court concludes that the *Nken* standard for requests for a stay has not been

2    met in the instant case and denies the Dhillons' request for relief.

3                              **III.    CONCLUSION**

4    The Dhillons' request for a stay of removal is denied.

5    This order disposes of Docket No. 3.

6

7    IT IS SO ORDERED.

8

9    Dated:  April 5, 2010

10                                        _____

11                                        EDWARD M. CHEN
                                          United States Magistrate Judge

**United States District Court**
For the Northern District of California